May it please the Court, my name is Eric Bossett. I represent Schering Plough and the other defendant appellants, and I have asked, with the Court's permission, for preserving five minutes for rebuttal. Class certification in this case should be reversed because the District Court below made several errors of law relating both to Plaintiff Wendell and to the putative class that requires reversal of the decision. Now, Wendell obviously still likes this stock. We know that. She's still suing on behalf of the plan, is she not? No, she's not, Your Honor. I think the Supreme Court's recent decision in the LaRue case clarified that in the context of a defined contribution plan, which is an individual account plan, Ms. Wendell's claim is an individual claim. She has standing to sue only to the extent that she invested herself in the stock fund. But doesn't the concurrence of Justice Thomas make it clear that she's still suing on behalf of the plan? Ultimately, the plan comes in and then they fix the accounts, correct? The phrase on behalf of the plan does not actually appear in the ERISA statute, Your Honor. Who can bring a claim here? The claim for breach of fiduciary duty under Section 409 can be brought by a participant, by a beneficiary, by the Secretary of Labor, or the fiduciaries. So if the Secretary of Labor were to bring this on behalf of the plan, what's the difference between the Secretary of Labor bringing it and Wendell bringing it? The difference, Your Honor, is that Ms. Wendell, who is the only plaintiff in this case, can only bring it if she has been injured and based on her own investment in the stock fund. She's still claiming that there was an injury to her. I mean, the stock dropped, what, was it February 15th, 2001? It was, what, 48? And then it dropped to about 42 the next day, is that correct, after the announcement? Right. She is claiming that the value of her individual account did fall. And on that basis, she would present a claim of statutory standing. It is our argument, however, that she waived her standing to recover for herself, for her loss, by reason of the general release and covenant not to sue that she executed. My point is more basic. If the Secretary of Labor can bring this, why can't an individual who's a participant in the plan bring it? An individual who is a participant in the plan can bring a claim for any injury to his or her account, only for his or her account. To the extent that's not, no, that's not the way I read LaRue. That's not what LaRue says. That's not what LaRue says. And I think it was made, and the clarification, I mean, you disagree with what Justice Thomas' concurrence was? No, Your Honor. We read Justice Thomas' concurrence as holding that there are, the plan's losses are simply an aggregation of the individual account's losses. And this we feel is the upshot, if you will, of all of the opinions in LaRue. There are no plan claims in a defined contribution context distinct from individual claims. So for a participant to bring a 502A2 claim for a fiduciary breach, that participant must have standing. That participant must have invested in the fund. She must have incurred some kind of loss to her account, and she must otherwise not be disabled from prosecuting the claim. She may be able to prosecute it. But LaRue actually says exactly the opposite. It says, we therefore hold that although 502A2 does not provide a remedy for individual injuries distinct from planning injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account. And it is a plan claim. Respectfully, Your Honor, I believe what LaRue is getting at with that formulation is to distinguish the defined contribution case from the defined benefit case, which was at issue in Russell. Because in Russell, the participant sought to recover for damages outside of the value of her account. But the Court clarified Russell. Russell was a case. Besides, Russell was a defined what? Benefit plan, correct? It involved a claim in particular for losses that were extra contractual, if you will, that were, according to the participant, reasonably foreseeable, but did not relate to the direct loss that he or she had, that I believe she had incurred in her account. Whereas in the defined contribution case. Again, just to pick up on what the majority said. You've got Justice Thomas saying the question presented here then is whether the losses to petitioner's individual 401k account resulted from respondents' alleged breach of their fiduciary duties were losses to the plan. Right. 50202 clearly provides for recovery for losses to the plan. In Graydon, this circuit. And individuals can bring it. Individuals can bring it if they otherwise have standing in the plan by reason of an investment that incurred a loss in their individual account. Put differently, Ms. Wendell cannot bring a 50202 action on behalf of any other participant. She has no legal interest under LaRue in the account of any other participant. She can only. Go ahead. She can only champion this claim as a class representative if she herself invested in the fund and incurred a loss. And if she otherwise meets the requirement. The district court didn't decide this issue. Pardon me? Judge Hayden didn't address this issue. Judge Hayden decided under 1110 that the releases were invalid. That's correct, Your Honor. And that's an error of law with respect to Judge Hayden. All but one other court in the country has held that section 410 does not apply to individual releases. It's clear from the context of 410 that it's meant to both permit plan sponsors to buy insurance or otherwise indemnify fiduciaries but not to pass a bylaw or enter into some kind of contract that immunizes all fiduciaries from all future claims. But that's not what a release of an individual dispute does. And that's why. You said a release of an individual dispute. It's not. She's bringing it on behalf of the plan. Yes. And it's a plan claim. Her release doesn't say, oh, and by the way, I can't bring anything on behalf of the plan, does it? Her release does not say that. Her release waives her own individual claims. We submit, Your Honor, though, that again, under the structure of a defined contribution claim, Ms. Wendell's standing is only as to her own account. And we think this is consistent with the court's decision in Graydon v. Connexent, where the court made clear that the loss in a defined contribution context is to the participant. Sure, recovery may pass through the plan, is what the court said in Graydon v. Connexent. But it must go in a defined contribution context back to the account participant in the form of augmented benefits. It is a traceable claim that just passes through the plan into the individual account. But in this case, it's not just for herself. It's, in effect, many others. She seeks to represent many others. Others who also have to have invested in the stock fund and also have had to experience the loss in their account if they didn't invest in the fund. Isn't this sort of the classic claim only that the advisory notes in the Supreme Court has said fits within the type of case you would want for under Rule 23B? Your Honor, there has been quite a bit of analogy between ERISA claims and trust claims. And often, that analogy is apt. In this case, it is not, because as the court held in UNISYS in a footnote, there is no analog to Section 404C, which is the individualized defense to liability available to fiduciaries in the trust context. But UNISYS, the facts in UNISYS came into existence prior to the regulation. Is that correct? The regulation came into effect October 13, 1992. That's correct. UNISYS is a well-reasoned decision. It's based on the plain language of Section 404C. But is UNISYS applicable any longer? Absolutely. UNISYS controls in this case, Your Honor. Because you've got the Secretary of Labor taking a different view. Yes, on a base. Than that, the view you think exists in that footnote in UNISYS. Well, the footnote that I refer to makes only the point, which is an important point, that the trust analogy breaks down in this case, Your Honor. It's not a guidepost, because there is no 404C analog to trust. I'll bet Professor Langbein would disagree with you on that. I'll have to defer to the court in UNISYS, which I think is an accurate statement as to the distinctive nature of 404C. And that's what's important. That's what the basis is of our argument that this class can't be certified. But the whole point of 404C for purposes of the class issue has to do with whether the 404C inquiry is an individualized inquiry or is across the board. And here, all the people who are involved here did exercise the control and chose this fund. So it's a plan, it's a common issue. It's not an individualized issue. We don't need to decide whether 404C applies as such. Even as, and in fact, the complaint, I think it's paragraph 194, makes a merits issue whether 404C applies. It says it doesn't. But for our purposes, all we need to decide is that this is not going to affect, it's not going to be a particularized inquiry. It's a common fact that everybody here chose it. So for class purposes, that's all we need to decide for 404C, is it not? No, Your Honor. First of all, we did submit in the court below unrebutted evidence that Schering's plan qualified as a 404C plan. And indeed, in a prior decision in the case, Judge Hayden indicated that the plan was clear. So what does that matter for class certification? So at that point, Your Honor, we've made our prima facie case that 404C applies. And therefore, the question becomes, and this is clear under Unisys, this is clear under the DOL's own regulations, whether or not each participant's loss was the result of his or her control. You're not hearing me. The 404C issue here is not an individualized issue, because everybody did exercise control and pick this fund. For class certification purposes, that's all we need to know. The 404C is not going to require an individualized issue. Everyone did pick the fund if they're a member of the class, but that's not the only component of 404C, Your Honor. There's also the requirement for the fiduciary protection to apply that the loss resulted from that selection process. But if you get there, if you get there, outside the issue that we have before us relating to the class, you've got an interpretation, pretty clear interpretation by the DOL that that defense does not apply to the initial picking of the types of investments that will be listed in the array that are available to employees. The Fifth Circuit in Long Becker correctly applied this court's common sense interpretation. Long Becker, and you've got the Fourth Circuit and DeFelice, and I'm not sure what's going on in the Seventh Circuit and Hecker, but it looks like they may be backing off a tad. The point here is that you've got what deference do we owe, if we get to this, what deference do we owe to the DOL? We believe that, to the extent as it does, that the DOL's position arises out of a footnote to the preamble to their regulation. Isn't even contained in the regulation itself. It was not in the Federal Register, just not in the CFR, right? Correct. It is not entitled to full Chevron deference. Both the Fifth and the Seventh Circuit have made that point. Well, and we did somewhat the same thing in Colachico. Right. But it still gets a skid more deference at the very least, doesn't it? Whether or not it gets skid more deference or simply respect, under any deference standards, it's our position that the interpretation advanced by the DOL is an impermissible cutback on the statute itself, on the plain language of the statute, which has no limitation. The plain language of the statute says that's determined by the Secretary of Labor. Actually, the Congress authorized the Secretary of Labor only expressly in the statute to develop regulations regarding the exercise of control. This footnote, though, purports to cut out from the scope of fiduciary protection under 404C on a basis of causation. The exercise of control of the assets in the account is spot on. In other words, it's the as determined under regulations of the Secretary. I mean, that couldn't be any more clear, could it? But this is not the footnote. You clearly have a plausible argument. Don't get me wrong. But it looks like the Secretary of Labor has decided for 17 years ago the other way. With respect to the Secretary of Labor, they had no authority to create an agency exception to the unlimited scope of the 404C protection afforded to fiduciaries. That sounds like an argument to Congress. It's an argument that the Department of Labor should be making to the Congress. They cannot bootstrap an exclusion in a statute that doesn't rest in the words of the statute itself. And for that reason, their attempt to do so through a footnote is an impermissible one. It's not been accepted by any other circuit court. This is not a Johnny-come-lately. I mean, part of the problem I had in Colachico was that after 77 years, all of a sudden you have a preamble to a regulation in which they change 77 years of history or a point of view. They have been consistent for 17 years. They filed amicus briefs in other cases. There is not one thing that anyone has found that shows that the Department of Labor has done anything at variance with what it stated in 1992. It is worth noting that the regulation itself didn't arrive until about 13 years after Congress passed 404C, which is 1978. So there's been a passage of time. We're all part of that, so be it. Fair enough, Your Honor. Tell me again for class certification purposes how this issue impacts the certification. The 404C? Yes. 404C, because it requires under every circuit court case, including Unisys, as well as the Department of Labor's own regulations, individualized determinations of participant control, not only and causation, therefore the evidence relating to those individualized inquiries is going to change from one participant to the next. And a decision that 404C applies to Ms. Wendell, let's say, which we think it does, by the way, does not preclude the claim of any other participant. And evidence will have to be adduced as to each participant as to whether their decision to buy, sell, hold the stock fund at any point in time in the alleged class period caused their loss and was controlled by them. But if a breach of fiduciary duty is shown, then that is the answer to your causation question, is it not? No, Your Honor. 404C is a defense to liability for breaches that are otherwise, for which the fiduciaries would otherwise be liable. Put differently, 404C assumes there's a breach. 404C kicks in only if there's a breach. That's what was clear in Unisys. That's where there's a definite... It's clear, and the Unisys court made this point, that fiduciary liability would otherwise exist but for a 404C defense in cases where 404C applies. And that's why the DOL's position in the case is also an unreasonable one because it in effect nullifies 404C. If it doesn't apply because there's no fiduciary breach, then you don't have to make inquiry into 404C at all. Do you want to talk about... We'll give you a few more minutes to talk about typicality and adequacy. Yes, Your Honor. We don't think Ms. Wendell is typical or adequate for this class. As we noted, she signed a covenant and a general release of all claims. But do we know what the class is made up of? How do we decide whether she's typical or adequate? Do we know how many people there are out there with releases or without releases? How big is the class? We don't know, but we know she's not a typical representative. She's the only representative, and she has waived her right to maintain this suit. And if she can't maintain this suit under general Rule 23 law, she can't represent anybody else either. Well, what if everyone else has a release also? The record, although not clear, does not suggest that everyone else has a release. This was a one-off termination of Ms. Wendell. She was not part of a reduction in force. This release is specific to her. It disables her from representing a class at a minimum. At a minimum, it is a unique defense as to her that renders her unsuitable to represent a class under this Court's decision in Beck v. Maximus because it's going to become the major focus of any future litigation. What happened with the other two plaintiffs? They voluntarily dropped out of the suit, Your Honor. And we have no one else? Well, I'll ask your colleague that. There is no one else who is a named plaintiff any longer in the suit. That's correct, Your Honor. I see my time is up. I'll answer any other questions. All right. We'll hear from you in rebuttal. Thank you. Thank you. May it please the Court. Peter Levin on behalf of Plaintiff-Affably Michelle Wendell. Maybe we can start with Wendell and also go to the end after that and ask a question about the class period, which we didn't talk about with your opposing counsel. But with Ms. Wendell, it would seem that this is hardly the paradigm for what you want as a good class representative. As you say in the deal world, there's a lot of hair on that. Can you find someone else? There are unquestionably some issues, Your Honor. We think that Ms. Wendell is a typical and adequate representative and think that the district court appropriately certified the class. What do we know of the class? I mean, in order for her to be typical and adequate, we've got to know who else is in there. There was no evidence put forth before the district court, Your Honor, on the class certification with respect to the release issue as to whether or not Ms. Wendell is or is not atypical in that fact. Don't we need that? I mean, in Millong, the District of Columbia decided that you can't have someone who has not given a release be an adequate or typical class representative of persons who have given a release. So how can someone who has given a release be typical and adequate? When you don't have anything to compare it to. I mean, don't we need more? Definitely under hydrogen peroxide, don't we need more? We think in this case, Your Honor, no. And the reason is just one example for the facts. The other two named plaintiffs who were originally in the suit, to our knowledge, had not signed a release. And I do concede. They're not around anymore. They're not in the class, are they? Agreed, Your Honor. But your question was whether or not other people in the class did not have releases. I agree with Mr. Vossett that this does appear to be a one-off release and not a broad release that was given to all class members. All right, so there we have one person who has signed a release and also covenant not to sue. And she has come into court and filed a complaint. Correct, Your Honor. She filed it on behalf of the plan, but she filed it. And she said she wasn't going to. Isn't there going to be an issue? We think there are three separate reasons, Your Honor, independently why the release does not affect Ms. Wendell's typicality or adequacy to write the claim. Well, that's the covenant not to sue also. Sure, because I think we believe it to be hand-in-hand, Your Honor, in many ways. As we asserted in the district court, and for the record I will identify it was at R97 at pages 4 and 5, while we have never contested the validity or the enforceability of the release, we do contest the scope of the release. As we argued in the district court, the release itself does not cover ERISA claims. Where is that in your brief to us? It is not in the principal brief, Your Honor. It was raised before the district court, a decision in the brief. We think that regardless of the enforceability of the release vis-à-vis Ms. Wendell, it does not affect her typicality or adequacy in light of the representative nature. But you're already talking about an issue now that's going to have to be decided about the scope of the release. And if she's the only one with a release, she's not going to be typical because there are some things that are going to drag her down that don't relate to the rest of the class. Well, Your Honor, we think that the district court appropriately recognized that the release will play no role in this case in light of the fact that this is a representative action on behalf of the plan, and the release by itself only addresses individual claims. But the district court didn't rule on that. The district court decided this strictly upon the invalidity of the release. Actually, Your Honor, the district court adopted and incorporated by reference the report and recommendation of Magistrate Judge Falk, which became the opinion of the court. And Judge Falk, in the report and recommendation, did in fact rely upon the representative nature of a 502A2 claim as the basis for finding that the release will play no role and does not affect Ms. Wendell's typicality or adequacy. How about the covenant not to sue? How does this lawsuit stand if that covenant not to sue is upheld? The covenant not to sue, Your Honor, suffers from the same infirmity as the release, or if you will, the same distinguishing feature of the release. That is that the covenant not to sue does not address the representative nature of a 502A2 claim. It doesn't accept that out. It says she can't file, and she filed. I thought what you were going to say is I won't file anything in connection with any aspect of my employment or termination, and this really wasn't her, certainly wasn't her termination, and you would maybe argue it wasn't her employment. But don't you have to have that ruled on? Your Honor, we do think that the scope of the release itself, excuse me, the scope of the covenant not to sue itself is limited to those particular issues that Your Honor. Well, we don't know, but does employment include ERISA? Well, Your Honor, if you take a look at the actual release and the separation agreement, which is in the record at appendix 329 through 331, it's a four-page document, which consists of an initial cover page and then three pages of the separation agreement. The very first page of the separation agreement, which is page 330 of the appendix, states that as a result of your termination of employment, you will receive, and then three, all other payments and benefits to which you are entitled under the company's benefit plans. This is the contemporaneous document that is part of the release and the covenant not to sue, and it evidences the party's understanding that notwithstanding the broad language of both the covenant not to sue and the release, that benefit claims or any claim for payment or benefits to which you would be entitled under the company's benefit plans, which this clearly is, would not be covered by the release or covenant not to sue. Wait a minute. You're arguing here that the victim is the plan, correct? Correct, Your Honor. So you need someone to bring a derivative claim on behalf of the plan, and you go out and the only person you get is one who says, oh, by the way, I release everything I have against the company relating to my employment or termination, which just creates a huge issue right away as to whether she's out, and a second issue as to whether she's typical of those others who may be benefited by a derivative suit here. In retrospect, you're mixing and matching ERISA with Rule 23, and Judge Rendell's questions really go to Rule 23. Okay. And how are we to determine that she is typical of the others? Well, Your Honor, the reason that I am mixing the two is I think that it's a standard, that you start with the ERISA standards and then you go to the Rule 23. And here, because it is a derivative action, because Ms. Wendell is representing the plan as the whole, and the plan is the real party in interest here. Well, that's for commonality. That's for commonality, but it also affects typicality, Your Honor, because in light of the derivative nature of the claim, the release and the covenant not to sue that she gave in her individual capacity are not relevant. But she has to be a typical and adequate class representative. And if her release is valid, I mean, maybe she can maintain the case, but if her release is valid and it means that if any monies are obtained by the plan, she can get nothing, then question, is she an adequate representative because of her, I mean, what if there's a settlement and they want to pay 10 cents on the dollar and it's been held that she should get nothing from that, what's her incentive to hold out for 60 cents on the dollar? Doesn't there need to be a showing that she's typical and adequate? Yes, Your Honor, but we believe that in light of the parties, and by parties I mean Ms. Wendell and Shearing Plough, in light of their clear and unambiguous understanding that the release and the covenant not to sue do not cover benefit payments or benefits to which you are entitled under the company's benefit plan. This isn't in your brief. This isn't in your brief. Your Honor, the decision, I made a decision in retrospect. It was a poor decision, but the decision was that even if you assume the enforceability of the release, even if you assume that the release would be enforced and would apply to these actions, that the release does not preclude Ms. Wendell acting as a class representative in light of the literally dozens of cases that we cited from district courts both around the country that have said this is a representative nature case. This is the 502A2 derivative claim. Any release that you gave in your individual capacity is irrelevant for these purposes. All right, so you're saying really for the first time that all this stuff having to do with the release is totally beside the point because the release specifically allows her to pursue benefits. I think our argument, Your Honor, is basically threefold. One, the release itself does not cover benefits, does not cover Ms. Wendell's right to seek payments or benefits to which she would be entitled. Because it says employment and termination. Because the covenant not to sue says employment and termination, and because the terms of the separation agreement itself on page 330 of the appendix say that as a result of your termination, you are entitled to all other payments and benefits to which you would be entitled under the company's benefit plans. That's the first step. That's huge. The second step, Your Honor, is that under the terms of the release itself, she is releasing only those claims that had accrued as of the date that she signed the document. She signed the document in August of 2000. And there's what, another seven months? Well, Your Honor, the complaint alleges breaches that took place in late 2000, 2001, 2002, 2003, and 2004. As a matter of fact, the complaint alleges that the truth about Shearing Plow and its stock didn't even start emerging until 2001. So even if the release somehow covered Ms. Wendell's individual right to pursue this action or to pursue or to receive benefits from this action, that would not cover any post-August 2000 claims which would affect her adequacy or typicality. The third argument that we make and that we spend the majority of our brief on, in retrospect, wrong decision, but was the representative nature of the action, the derivative nature of a 502 action, 502A2, which means that any individual release that she gave isn't relevant because it's in a different context. It's to her ability to maintain it and to the commonality of the issue. If she's proceeding on behalf of the plan, the common issue is the plan and she can be the person. But it doesn't really, it isn't that probative of her typicality and adequacy. Because we don't know, I've never seen a class representative talk about typicality and adequacy without knowing the makeup of the class. Because you have to know whether she's typical and adequate by reference. I mean, doesn't this case have to go back and have a more rigorous understanding a la hydrogen peroxide? I mean, you know, Eisenberg is, you know, when in doubt, certify the class. It leads to errors, we said, in hydrogen peroxide. And the class period, doesn't this have to go back for more scrutiny of exactly what the typicality and adequacy is here? We respectfully don't believe so, Your Honor. Because the only evidence, the only argument other than the deposition testimony, which I can get to if the court would like, but the only evidence and argument other than the deposition testimony is the release. We believe that the district court appropriately discarded the release, saying that's not relevant to this kind of a claim. And if you get rid of that, then there's no typicality or adequacy. You're throwing in this whole benefit piece that benefits are accepted. And that's huge. That is huge. Well, actually, wouldn't your better argument of the three that you mentioned there really be that the release came into being when she was terminated in 2000, and the stock drop came in February of 2001, and it's Hornbook law that releases only exist as of the date. You're releasing everything up to the date of the release. But when you say that, even if you say yes to what I just said to you, everything you keep saying after that keeps coming back to this, but she was filing a derivative claim, which is what you briefed. And then you come to the next point, which is Judge Rendell's point, how do we know in comparison to anyone else that she is typical of those other people? And I suppose the answer that you might give, but I'm not sure it works, is that it's everyone who had elected in the plan what's really the plan's claim. But I guess who would she be typical of, those who elected? She would be typical of the other plan participants who had elected to invest their 401K savings within the company stock fund. But who had not released their claims? Well, if the release is inapplicable, Your Honor, then the release itself would not render her atypical or inadequate. I mean, one of the relief provisions says, and allocate to the individuals. Well, if she isn't going to be able to get any of that allocation, then she's a little different. If there are 99 other class members and they all are going to be able to get something, and she, because of the release, is not going to be able to get something, she's a little different. I think his argument is that she will get something because her release predated the stock drop. That is, Your Honor. And so we believe that if Ms. Wendell's release were effective, if it were valid, and if it would preclude her ability to receive any benefit in the event that this case went to trial or otherwise resolved, I would not be standing here. But it is our belief that the release, one, does not cover these claims, two, predated the events in the complaint, and three, don't even come into this kind of a case in light of the representative nature of 502. But the events are the breaches of fiduciary duty, not necessarily stock drop that resulted from it. That's correct, Your Honor. And the breaches of fiduciary duty here could have happened before 2000, didn't they? Well, Your Honor, under ERISA, there's an ongoing duty to monitor the prudence of all investment options, including the company's stock fund, and that duty would have continued well beyond the date of the release itself. I see that I'm out of time, Your Honor. I'd be glad to answer any other questions. I think we'll hear from the Secretary of Labor.  Good morning. May it please the Court. My name is Elizabeth Hopkins, and I'm here on behalf of the Secretary of Labor, as amicus curiae, in support of the plaintiff's appellants. What is your view as to whether 404B may not be relevant in the context of determining whether there is a viable class action here?   I'm sorry. No, no, no. It's a precondition. In other words, is what you are going to talk about, which is the deference that we should accord to 404C and the interpretation given to that for over a decade and a half by the Secretary of Labor, is that even relevant in the context of talking about certifying a class action, which is what's on appeal here? I think you could probably decide this case without getting to that issue of the 404C regulation and the deference to the Secretary's interpretation in that regulation, because as I understand it, I mean, there can be, of course, individualized determinations under 404C, but as I understand it, what's being alleged here are really class-wide breaches, and what's being alleged with regard to 404C is that, you know, because of the alleged information that was not given to participants, that 404C really isn't a 404C plan under the regulation, even assuming that 404C could apply to the selection and maintenance of an investment option under the plan. So I think it would be possible for you to decide it without getting to the 404C interpretation by the Secretary of Labor. Although you might say that from a causation standpoint, if, let's say, 20% of these individuals did know the same information that the investment committees and the others did know, then their loss would have resulted not from the breach of fiduciary duty by these individuals, but by their own choice, that notwithstanding all these horrible things that were happening and no drugs in the pipeline and all these other things, they chose. So, I mean, there is a possibility, is there not? I think there's a possibility, but as I understand it, the way this case was plaid and what's being alleged here is that the imprudence was that plan fiduciaries allowed the sharing class stock to be maintained during this period when they and only they had reason to know that the stock was overpriced and that none of the participants could have known this. Other investors on the market couldn't have known this information. And that is, I think, the allegation. It's true that the claim is to allow it to be chosen. I mean, Wendell herself says, well, gee, if they're allowing me to have 50% of my money in it, then they must think it's okay. And that decision by the investment committee and the powers that be to permit it to be in the mix might just take it out of individualized inquiry. Yes, I think it takes it out of individualized inquiry. And I think it's interesting that you bring that up, because I think that really goes to why the Secretary's interpretation of 404C, or one of the reasons why the Secretary's interpretation of 404C is correct. Because, you know, in the context of employer stock, of an employer stock claim, and especially in the context of a claim where the claim is that the fiduciaries knew something that the participants could not possibly have known, you know, it really makes sense to say those losses, you know, were caused by, were only within the control of the fiduciaries and were not within the control of the plan participants. And that's exactly what the Secretary's 404C regulation does. And with respect to this argument that this is only in a footnote in the preamble to the regulation, I have to disagree. By the terms of the 404C regulation, it provides that fiduciaries who breach their duty under ERISA have a limited pass for liability for losses that are caused by the participant's exercise of control over his individual account within a defined benefit plan and says that. Before we come back to where we were, but the question here would be is why wasn't that put in the regulation to begin with? Why was it put in the preamble? Well, what is in the regulation is that the loss has to be the direct and necessary result of the participant's exercise of control and. Obviously, there was a, the perceived wisdom was you needed to interpret that and you interpreted it by means of a preamble with a footnote to the, a sentence in the preamble. Why not put it in the reg itself? You know, I can't say why that wasn't put in the reg, but I have to say it's not just in the preamble, it's in the text of the, I mean, it's not just in the footnote in the preamble, it's in the text of the preamble. And I would say it's just an explanation of one particular application of this pretty limiting language that's in the text of the regulation itself, which says that, you know, it has to be independent control over the assets and that it has, the loss has to be due to, has to be the direct and necessary result of the participant or beneficiary's exercise of control. On the question of deference and the deference that's due to this, whether you look at this as, you know, this preamble as part of the regulation or not, because it was, it was part of the notice and comment rulemaking, it was in the notice of proposed rulemaking, it was in the final regulation, and I think there is support in cases from the Supreme Court like Yellow Transportation Inc. versus Michigan for giving Chevron deference to this kind of explanatory statement in the preamble to a regulation. But even if one says, well, because it's not published in the Code of Federal Regulations, that it's not technically part of the regulation, at a minimum, it's the Secretary's interpretation of that regulation, which under cases like Long Island Care versus Coke, our, which, you know, is really probably the seminal case on this, is entitled to the same level of deference. It may not be cold Chevron deference, but it's entitled to controlling weight deference as an interpretation of our own regulation. Why would the broad hour deference apply here? In hour, the interpretation was in a brief by the Secretary of Labor, but so long as it's an interpretation of the Secretary's regulation, it's entitled to the highest level, controlling weight deference so long as it's reasonable. But why don't we just do here what we did in the Colachico case, which is when you have something in a preamble, then you can go and look at it to the extent it's persuasive under Skidmore, then you give it deference. Yeah, I think that even if that's the level of deference here, with all due respect, I don't agree. There's a good argument. It's a very plausible way of looking at what you did here. Yes. You could have gone the other way. You could have gone the way you did. Yes, I think not just plausible, not just permissible, but really the best reading of the statute, for three reasons at least. First, ERISA really places very stringent trust law duties on fiduciaries, especially with regard to plan asset management. I mean, that's exactly what Congress had in mind in order to protect plans and plan participants. And second, and really relatedly, both in Section 404C and elsewhere in ERISA, the statute only exempts fiduciaries from liability where their duty, where their powers have been properly delegated to and exercised by another party. You know, as the Supreme Court put it very well in Mertens, what ERISA does is allocates liability for plan-related misdeeds in reasonable proportion to the respective actors' powers to control and prevent the misdeeds. And here, I don't think anyone is arguing or could possibly argue that only the fiduciaries and not plan participants had the power to designate the investment alternatives. And third, as I sort of started out with, 404C, the application of it here would be particularly unfair because this was a basic act of plan management. It would leave the fiduciaries to suffer the consequences in the context of a case where the allegation is only, or the plan participants to suffer the consequences, where only the plan fiduciaries are alleged to have had the adequate information. So one can hardly say that they made this independent choice when they didn't know what they were choosing, so to speak. And that is, you know, that is the heart of this case. And I also think it's significant that in the legislative history of this very provision of Section 404C, Congress questioned whether employer stock funds would ever meet the participant control test because, you know, of concerns about undue influence that could be exerted by employers in this context. Now, the Secretary didn't take employer stock funds off the table altogether, but what the Secretary did take off the table was the selection and maintenance of any kind of investment option, including employer stock funds. I see my time is up. Thank you. Thank you. Your Honor. Before you begin your rebuttal, could we ask counsel to address the class period, whether the case needs to go back because of that period identified, and then we'll let you have your rebuttal. We just want his position on that before we have yours. I mentioned that and I forgot to follow up. Yeah, because that was not the court took the view that it really didn't have to look at that because there hadn't been discovery. So the identification of the class is very broad to the present, which seems under hydrogen peroxide to be something that would be cause for remand. Would you agree? Your Honor, in this case, we think that because of the court's bifurcation of discovery and precluding us from engaging in merits-based discovery even six years after that we filed this case to begin with, which of course was issued long before the hydrogen peroxide decision, that it was appropriate for both the magistrate and the district court to temporarily certify an open-ended class period. Both opinions recognize that this would not be the case in the future, but given the fact that the plaintiffs do not have a merits-based discovery at this point and the test is when the stock became prudent again, if ever, you've basically created an impossible situation in light of the pre-hydrogen peroxide bifurcation. How can you say it should be the – I mean, you don't want us to affirm that it's up to the present. That doesn't make any sense. If the stock drop was in February of 2001, at some point there has to be other intervening events that's going to cause this class period to stop. I mean, that's de rigueur. That's what happens in every case. Your Honor, I don't – the class period we expect will certainly not extend to the present at the time of trial. The problem is that we don't have the merits-based discovery. With respect to the 01 date, we'll say that the date that the defendants have put forth, the district court rejected as based on inapplicable securities law principles, number one, which the defendants have not addressed in the appellate briefs before this court. And number two, the complaint itself actually does allege acts which would form the predicate of breaches of fiduciary duty through 2004. So there was, in fact, a drop in 01, but there were additional drops that happened after 01 where the stock dropped from a high of $60. But we don't know if the drop allegedly in result to the Clarinx matter or not. Excuse me, Your Honor. We don't know what later drops, if they were really related to the Clarinx matter. Well, Your Honor, the Clarinx matter was only one of several different theories asserted in the complaint. There was also the illegal kickbacks, which took place throughout 2002 to 2004, where Shearing ended up paying, I believe, it was about a four. And that was in the February 15 notice as well? I'm sorry, Your Honor? That was in the February 15, 2001 notice? That was not, Your Honor. That took place after February 15, 2001. And that's one reason that we think that the unilaterally selected date of February 2001 that the defendant selected is inapplicable. There are additional breaches of fiduciary duty based on both the Clarinx and then this illegal kickback scheme by which, or I guess in response to which, Shearing, I believe, I don't have the documents in front of me, but I believe paid $300 or $400 million in fines to the federal government in light of the kickbacks, which, again, was information that was kept from the plan participants. And you're saying a limited amount of discovery or some agreement could not have defined or picked a date, an outside date other than the present? Your Honor, we attempted to go back to the district court to get a reversal, if you will, or an opening up of merits-based discovery, and that was denied. So we were in a point of where we did not get those documents. We attempted to open the merits-based discovery. We did not. And so in light of that situation, which, again, predated hydrogen peroxide, we believe that it was appropriate for the district court to certify an open-ended class period, with the understanding that we would be coming back and proposing a more modified and limited class period after we've had receipt of merits-based discovery and can make the appropriate determinations. It didn't say that. Yeah. It defined a class, like to the present, without leaving. It looks like that was a definitive decision. Well, I believe, Your Honor, if you look at Magistrate Judge Falk's report and recommendation, which, again, was incorporated into the opinion of the court, that he suggests that there will, in fact, be subject to future modification. And the basis of that was the fact that there had merits-based discovery had not yet commenced. All right. Thank you. Thank you. Mr. Bossert. Thank you. The general release in covenant not to sue can be found in A331 of the record. What about the argument that a release can only exist as of the date it is given and releases all claims prior to that date? It cannot release any future claims that accrue after the date of the release. Your Honor, the release applies to claims that accrued as of the date of its signature, correct, and any continuing effects of those claims going forward. And we cited in our brief several cases for that proposition regarding the foreclosure of continuing effects of prior breaches. No, that doesn't. You're releasing claims that you have relating to your employment and termination as of the date of the release. If a cause of action accrues after the date of the release, you're not releasing that. That's Hornbook law. If it's a new cause of action, it's not covered by the release, but it is covered by the covenant not to sue. And this Court has held that those covenants have separate legal significance and they foreclose future claims. That's the difference between a covenant not to sue and a release. You have a covenant not to sue with respect to any causes of action that exist as of the moment you sign the release. With respect, Your Honor, the covenant actually does not limit itself to causes of action that existed at the time, but also that would accrue later. And it has a prospective consequence. It supports what you think that says? I've looked at this in the past, and I haven't found any. We think the Medtronic decision that we cited in our brief, Your Honor, makes clear the different consequences of a covenant versus a release. It happens to be in footnote 4 of Medtronic, and we cited it. It was not addressed at all by Judge Falk or by Judge Hayden. But in that case, this Court made clear that a covenant not to sue has a perspective as distinct from a retrospective consequence, and that's why the two are different. But a covenant not to sue can only exist with respect to causes of action. In other words, I will not sue in the future with respect to causes of action that exist as of the date of this release. Actually, the terms of the release in A331 are not so limited, Your Honor. They also apply to, and in fact Medtronic makes clear, that covenants apply to claims that accrue in the future. It is a prospective bar, if you will, Your Honor, and we think together. I'm not sure I buy that. It blocks Ms. Wendell's claim in its entirety. Not just the release, not just the covenant, but together they serve to block her claim in its entirety. What does note 4 in Medtronic say that supports that? You're saying it supports it, but we don't have anything on point. We believe that the reasoning of Medtronic, like the description of the difference between a covenant not to sue and its intent and its legal effect, as distinct from a release, has prospective application. It means she cannot sue claims that have accrued or will accrue. And that's, I believe, what the language in Medtronic says. That doesn't make sense. If I say I'm not going to sue you with regard to actions that you and I had in the past, then everything that we've done in the past may fit in. But if you then do something to me tomorrow, my covenant not to sue cannot apply to that. Well, I think it would be helpful to look at Ms. Wendell's covenant. She says, I will not file a lawsuit against the company, which is defined in the covenant to include the individuals, officers, and employees as well, in connection with any aspect of my employment or termination. The employment aspect is what is relevant here because employee benefits under ERISA relate to her employment. And the covenant by its own terms is not limited just to the claims she knew about at the time that she signed the release. But what about the whole exclusion, that opposing counsel site saying, but by the way, I'm entitled to all my benefits. There's no such exclusion. That's why I wanted to make sure the court had in the record A331, the release language, and it would be able to determine for itself. The release is any and all claims. There's no exception for benefits. But what's the reference to benefits that your opposing counsel has mentioned? There is none. There is no exemption for benefits. It is a general release of all claims. But that document doesn't include the word benefits? It does not. Correct, Your Honor. That's why I wanted to bring it to the court's attention. We may need a clarification of that from opposing counsel after you're finished. Let me also ask you back to, I'm trying to figure out what I call a cart and horse problem, which is if the cart or if the horse is Rule 23 and does this fit as a class action, your point about 404C was that, as I understood it, but there can't be because I have a defense that as a matter of law should preclude this action from the get-go. Is that correct? No. It doesn't preclude the action. It requires individualized determinations that, in this case anyway, preclude certification. Okay. Because it is a defense to liability. In this Court, in the UPS v. Hoheider case, just a couple of months ago made clear that for purposes of certification, it's necessary to look at the entire liability framework. You cannot simply deconstruct the statute under which liability is being asserted and find that one component that's class-suitable. Go ahead, Mitch. But the complaint here specifically attacks the defendant's making this investment available and keeping it available, and that's alleged as the cause, the direct and necessary cause. So the fact that somebody chose later is beside the point, is after the fact, literally and figuratively. The purpose of 404C is to allocate liability in the context of dual causation. The premise is in a 404C case that there is a fiduciary breach. Well, you're saying dual causation. You talked about a contributing factor, but it says as a result of. And here they're claiming, and they may not win on this, they're claiming that the problem here was that you made this available and you kept it available because it was a bad option to give to people and just shouldn't have been there. If I may give one example to illustrate our position. As the Court noted, the stock dropped 25 percent after February 15, 2001. That next day, every participant had the decision to make. Do I buy more stock fund? Do I sell my stock fund? Do I hold my stock fund? And we submit that any losses that would have accrued after that date would be the result of the decisions that participants made then and there as to what to do with their fund. But they're saying in January of 2001, you knew all the bad stuff, and you should have said, everybody, get out of this fund. We're no longer making it available. And this is why the Court makes clear that district courts cannot rely on allegations for purposes of certification. It's got to delve behind the pleadings because, in fact, the underlying allegations relate to manufacturing problems. They were widely known. We're talking about employees who worked at Schoenplau, not third-party investors. They were there. Many of them were involved in fixing the problem. So individual inquiries will ferret that out. We'll ferret that out. Thank you, Your Honor. Thank you very much. Yeah, can I have just one comment? You referred to benefits, yes. Can you tell us where in the record there were benefits? The release that Mr. Bossert is referring to on page 331 actually has a page 2, if you look on the very top of it. The release is page 2 of a three-page agreement called separation agreement. Right. The language that I was referring to is on page 330, which is the immediately prior page. Okay. And it says, please review and read the following notice and general lease very carefully. So it's a three-page document. And is that where the benefit? Correct, Your Honor. Is on 330? It's on page 330. And the separation agreement itself is 330 through 332, and then in the record there's an initial cover page at 329. Thank you for that clarification. Thank you. Counsel, this has been a very good argument, very helpful. We would ask that you arrange to have a transcript made for the benefit of the panel. You can talk to the crier, talk to Mr. Williams about arranging for that. Thank you. Thank you. Actually, I guess go to the clerk's office is the easiest thing. Yeah, go to the clerk's office or call the clerk's office about arranging for that. You don't need to bother Mr. Williams. All right. Thank you very much. The case was well argued. We'll take it under advisement. Can I go one more? And we will call our next case, U.S. v. Tracy.